FILED & ENTERED

MAR 13 2015

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY zick          DEPUTY CLERK

# NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## NORTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 9:11-bk-15294-PC |
| | ) | |
| | ) | |
| JEFFREY SCOTT WETTSTEIN and | ) | Chapter 7 |
| NATORAE MARIE WETTSTEIN, | ) | |
| | ) | |
| Debtor. | ) | Adversary No. 9:12-ap-01055-PC |
| _____ | ) | |
| | ) | |
| SHELLY JENSEN, | ) | |
| | ) | **MEMORANDUM DECISION** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFREY SCOTT WETTSTEIN and | ) | Date:   February 6, 2015 |
| NATORAE MARIE WETTSTEIN, | ) | Time:   9:00 a.m. |
| | ) | Place:  United States Bankruptcy Court |
| | ) | Courtroom # 201 |
| Defendants. | ) | 1415 State Street |
| _____ | ) | Santa Barbara, CA 93101 |

Shelly Jensen ("Jensen") seeks a judgment against Jeffrey Scott Wettstein ("Wettstein")

in the amount of $607,225, plus attorneys' fees and costs of court, and a determination that the

debt is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6).[1]  Trial of this

---

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the
Bankruptcy Code, 11 U.S.C. §§ 101-1330 after its amendment by the Bankruptcy Abuse
Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005).  "Rule"
references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable

adversary proceeding was commenced and concluded on February 6, 2015.  Having considered the parties' Amended Joint Pre-Trial Stipulation ("Trial Stip."), the evidentiary record and arguments of counsel, the court will enter a judgment in favor of Jensen based upon the following findings of fact and conclusions of law made pursuant to F.R.Civ.P. 52(a), as incorporated into FRBP 7052.

## I. STATEMENT OF FACTS

In early 2010, Wettstein was seeking to raise capital for a new business venture -- Stone Ventura Capital, LLC ("Stone Ventura"), a company that was to be formed for the purpose of buying distressed real properties, improving them, and selling them at a profit.  Wettstein met with Bambi Holzer, who owned a financial planning firm known as Bambi Holzer Financial Group ("BHFG").  Holzer told Wettstein that she was in a position to raise capital for private placements, such as Stone Ventura, from her clients, and that she could raise $10 million for Stone Ventura if Wettstein and/or his investors purchased a 20% interest in BHFG for $300,000.[2]

To raise the $300,000, Wettstein contacted Jensen with whom he had been involved in a prior real estate investment.[3]  Based on his discussions with Wettstein, Jensen agreed to invest $225,000 of his own funds and obtained the agreement of his girlfriend, Jane E. Milmore, to invest an additional $75,000.  To fund his portion of the investment, Jensen borrowed the $225,000 from his 401K plan.

---

certain Federal Rules of Civil Procedure ("F.R.Civ.P.").  "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

[2]  In his brief, Jensen asserts that Wettstein needed to purchase an interest in BHFG "in order for Holzer to solicit her clients without running afoul to [sic] the Financial Industry Regulatory Authority's ("FINRA") stringent rules against soliciting clients."  Plaintiff Shelley Jensen's Trial Brief, 2:15-17.

[3]  Wettstein met Jensen in 2005 or 2006 through Joey Cappuccino ("Cappuccino"), who had been an employee of Wettstein's Preferred Mortgage Group.  At the time, Cappuccino was dating Jensen's daughter.

Because Jensen "did not want to directly own" BHFG stock nor did he "want to directly invest in Stone Ventura's real estate investments,"[4] Jensen, Cappuccino, Milmore and Wettstein created JWCM Management, LLC ("JWCM")[5] on or about April 2, 2010, to serve as the managing member of Stone Ventura, which was later formed by Wettstein, Cappuccino and Jensen.[6]  Jensen, Wettstein, Cappuccino and Milmore were shareholders of JWCM.  Jensen was the majority shareholder.

 On or about April 7, 2010, Wettstein and Cappuccino executed a Non-Negotiable Promissory Note ("Note") in the original principal sum of $225,000, payable to Jensen, dated April 2, 2010.[7]  The Note required Wettstein and Cappuccino to repay the $225,000, with interest, as follows:

Principal shall be paid as follows:

> (a)  Two Hundred Twenty five Thousand Dollars ($225,000) shall be paid as "Preferred Debt" of JWCM MANAGEMENT, LLC.  "Preferred Debt" is defined as a "Senior Expense" and is paid 100% from all revenues generated from firm until "Preferred Debt" is paid in full.  No other company expense incurred by JWCM MANAGEMENT, LLC will be paid by JWCM MANAGEMENT, LLC until the "Preferred Debt" is paid in full.

> (b)  After 60 days of the execution of this note, interest on the remaining unpaid principal balance of this Note shall be paid 12% annual interest rate (1% per month) on remaining principle [sic] balance until debt is paid in full.  Interest payments to be paid monthly to Shelley Jensen, Holder, by the 3rd of each month starting in July of 2010.  Interest expense payments are paid by Jeff Wettstein and

---

[4] Defendant Jeffrey Scott Wettstein Trial Brief, 2:5-6.

[5] JWCM is "an acronyn for Jensen, Wettstein, Cappuccino and Milmore."  Plaintiff Shelley Jensen's Trial Brief, 2: n.2.

[6] The parties understood that Wettstein and Cappuccino would be responsible for attracting investors in Stone Ventura, as well as the acquisition, rehabilitation, and resale of properties by Stone Ventura.  Jensen's role in Stone Ventura was limited to his status as an investor.

[7] A similar note was executed by Wettstein and Cappuccino to Milmore in the amount of $75,000.

Joey Cappuccino and are not paid by or in anyway an expense of JWCM MANAGEMENT, LLC or Shelley Jensen, an individual.[8]

The Note further provided that Wettstein would "immediately assign/transfer, upon demand by the 'Holder' Shelley Jensen, all percentage ownership rights of Bambi Holzer Financial Group until all debt is paid in full to include all remaining principle [sic], interest, and late fees."[9] Pursuant to the notes, Wettstein received funds from Jensen and Milmore totaling $300,000.

On or about April 8, 2010, Holzer and Wettstein executed a Stock Purchase and Sale Agreement ("SPSA") "dated effective as of close of the business day on March 31, 2010," in which Holzer agreed to sell 20% of the common stock in BHFG to Wettstein for the sum of $300,000.[10] Page 1 item 2 of the SPSA, which Wettstein identified at trial as the SPSA executed by Holzer and himself, states:

> "Purchase Price. The purchase price for the Shares is Three Hundred Thousand Dollars ($300,000.00) (the 'Purchase Price')."

Pursuant to the agreement, Wettstein paid the sum of $300,000 to Holzer and in consideration therefor, received BHFG's Stock Certificate No. 3 dated April 1, 2010, certifying that Wettstein was the owner and holder of 20 shares of common stock in the corporation.[11]

Wettstein admits that he did not have an agreement with Holzer when he started his discussions with Jensen regarding the formation of JWCM and Stone Ventura, but he reached an agreement with Holzer on April 7, 2010. Wettstein testified that he reached the agreement with Holzer after receiving the funds from Jensen but before executing the Stock Purchase and Sale Agreement with Holzer. Wettstein's agreement with Holzer was memorialized in a letter from Holzer dated April 7, 2010, which bore the letterhead of "Wedbush Morgan Securities" and stated:

---

[8] Plaintiff's Exh. # 1.

[9] Id.

[10] Id. at Exh. # 3.

[11] Id. at Exh. # 6.

Dear Jeff,

This letter memorializes my intent to raise capital to fund your Private Placements.  If Wedbush decides to sign a selling agreement, then it would be done with them as the clearing firm.  If not, I would refer my friends and contacts to you directly.  Either way I look forward to working with you and developing a productive partnership for both of us.

Fondly,
Bambi Holzer[12]

In an email to Wettstein dated May 10, 2010, Jensen asked Wettstein to send him "copies of the personal guarantees from Bambi to [Wettstein] and from [Wettstein] to [Jensen] for the 300K." Jensen testified that, in response to his May 10, 2010 email, he received an email from Wettstein dated June 7, 2010 which stated, in pertinent part:

> Attached is the agreement/memo that notes Bambi's acknowledgement of not only the purchase of 20% of her company but also the intent and guarantee to raise capital (refer to page 1 item # 2).[13]

The SPSA attached to the email transmitted to Jensen on June 7, 2010, bore the signatures of Wettstein and Holzer.  Page 1 item # 2 of the SPSA stated:

> Purchase Price:  The purchase price for the Shares is Three Hundred Thousand ($300,000) (the 'Purchase Price').  Bambi Holzer acknowledges, the $300,000 received to purchase 20% of Bambi Holzer Financial Group includes her intent and guarantee to raise capital up to an amount of $10,000,000 for the distressed real estate private placement offering of which Jeffrey S. Wettstein is the General Manager/Managing Member.  If in fact, for any reason, Wed Bush Securities decides not to endorse or sign a selling agreement, Bambi Holzer will still be responsible and guarantee the raising of the above noted capital.  The capital will then be attained through a direct referral of clients from Bambi Holzer to Jeffrey S. Wettstein.[14]

---

[12] Id. at Exh. # 7.

[13] Id at Exh. # 5.

[14] Id.

Despite her representation to Wettstein, Holtzer did not raise the $10 million for Stone Ventura. Without sufficient capital, Stone Ventura was unable to acquire any properties and ultimately failed.

Interest payments due to Jensen were made in accordance with the Note for the months of July, August, September, October, November, and December 2010 and the months of January and February 2011. When Jensen did not receive interest payments after February 2011, Jensen notified Wettstein and Cappuccino of their default and declared the Note immediately due and payable.

On July 29, 2011, Jensen sued Wettstein and Cappuccino for damages for alleged breach of contract, fraud and unjust enrichment in Case No. 56-2011-00401326-CU-BC-VTA, Jensen v. Cappuccino, et al., in the Superior Court of California, County of Ventura. During the litigation, Wettstein transferred the 20 shares of common stock in BHFG to Jensen and Millmore. The shares were delivered on October 10, 2011.

On November 16, 2011, Wettstein and his spouse filed a voluntary petition under chapter 7 of the Code, and Sandra McBeth was appointed as trustee. In their schedules, the Wettsteins listed Jensen in Schedule F as the holder of an unsecured nonpriority claim in the amount of $225,000 based on the Note. The Wettsteins also listed Millmore in Schedule F as the holder of an unsecured nonpriority claim in the amount of $75,000 attributable to a personal loan. The Wettsteins received a discharge on October 22, 2012. On November 5, 2012, Jensen filed a Proof of Claim # 7-2, asserting a claim for the balance of $384,220.72 in principal, accrued interest and other charges allegedly due under the Note. No objection has been filed to Jensen's Proof of Claim # 7-2.

On March 5, 2012, Jensen timely filed his complaint against Wettstein and his spouse, Natorae Marie Wettstein, in the above referenced adversary proceeding seeking a judgment for not less than $225,000, together with accrued interest, attorneys' fees and costs, and a determination that the debt is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and

(a)(6).[15]  Wettstein filed his answer to Jensen' complaint on April 5, 2012.  After a trial on February 6, 2015, the matter was taken under submission.

## II. DISCUSSION

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b).  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I) and (O).[16]  Venue is appropriate in this court.  28 U.S.C. § 1409(a).   Objections to the dischargeability of a debt are literally and strictly construed against the objector and liberally construed in favor of the debtor.  See  Quarre v. Saylor (In re Saylor), 108 F.3d 219, 221 (9th Cir. 1997).

A.  Wettstein's Debt To Jensen Is Nondischargeable Under 11 U.S.C. § 523(a)(2)(A).

Section 523(a)(2)(A) excepts from discharge in bankruptcy "any debt for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud."  11 U.S.C. § 523(a)(2)(A).  To establish that a debt is nondischargeable under § 523(a)(2)(A), the plaintiff must show by a preponderance of the evidence that (a) debtor made a representation; (b) at the time, debtor knew the representation was false; (c) debtor made the representation with the intention and purpose of deceiving the creditor; (d) the creditor justifiably relied on the debtor's representation, and (e)

---

[15] On April 4, 2012, Jensen agreed to a dismissal of all claims against Natorae Marie Wettstein without prejudice.  See Stipulation for:  (1) Withdrawal of Claims Against Natorie Marie Wettstein Without Prejudice; (2) Extension of Time to File Complaint Objection [sic] to Discharge of Certain Debts; (3) Extension of Time for Jeffrey Scott Wettstein to Respond to Adversary Complaint [Dkt. # 5] filed on April 4, 2012.

[16] Although it does not appear that any of the claims made the basis of Jensen's complaint constitute "Stern claims," the parties at trial nevertheless expressly consented to the entry of a final judgment by the bankruptcy court.  "Stern claims," so named after the Supreme Court's decision in Stern v. Marshall, ___ U.S., ___, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), "are claims 'designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter.'"  Mastro v. Rigby, 764 F.3d 1090, 1093 (9th Cir. 2014) (citation omitted).

the creditor sustained the alleged loss and damage as the proximate result of such representation. Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010); Diamond v. Kolcum (In re Diamond), 285 F.3d 822, 827 (9th Cir. 2002).  "The burden of showing something by a 'preponderance of the evidence,'. . . 'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'"  Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1933) (citation omitted).

Because direct evidence of intent to deceive is rarely available, "the intent to deceive can be inferred from the totality of circumstances, including reckless disregard for the truth." Gertsch v. Johnson & Johnson Fin. Corp. (In re Gertsch), 237 B.R. 160, 167-68 (9th Cir. BAP 1999); see Nahman v. Jacks (In re Jacks), 266 B.R. 728, 742 (9th Cir. BAP 2001) ("Because fraud lurks in the shadows, it must usually be brought to light by consideration of circumstantial evidence." (internal quotation marks and citation omitted)).

1.  Wettstein's Alleged Misrepresentations

Jensen's fraud claim against Wettstein is based upon one or more of the following representations allegedly made by Wettstein to induce Jensen into investing $225,000 in Stone Ventura:

> 1.  That the sum of $300,000 paid by Jensen and Milmore to Wettstein was to be used to fund Stone Ventura when, in fact, Wettstein intended that the proceeds be used to obtain a 20% interest in BHFG.
> 2.  That Wettstein (a) would honor the note when, in fact, he had no intention of complying with the Note; (b) would make payments timely when, in fact, he had no intention of making the monthly payments on the Note; and (c) would pay the Note upon default when, in fact, he had no intention of paying the Note upon default.
> 3.  That Holzer guaranteed that she would raise $10 million in capital in the form of a SPSA between Wettstein and Holzer.
> 4.  That Holzer guaranteed Jensen's $225,000 investment in Stone Ventura.
> 5.  That Wettstein had obtained Holzer's promise to use Wedbush Securities to raise $10 million in capital.
> 6.  That Wettstein, at the time the Note was made and the loan proceeds were delivered, had an ownership of 20% in BHFG.

First, there is no evidence to support a finding that Wettstein <u>falsely</u> represented to Jensen that the $300,000 Note proceeds were to be used to fund Stone Ventura instead of purchasing a 20% interest in BHFG.  Nor is there evidence to support a finding that Wettstein <u>falsely</u> represented that he owned 20% of BHFG at the time the loan proceeds were delivered pursuant to the executed Note.  According to the evidence adduced at trial, Wettstein, Jensen, Milmore and Cappuccio all understood that Holzer offered to provide the necessary capital for Stone Ventura through BHFG, but that it would be necessary for them to purchase a 20% interest in BHFG for $300,000 to permit the solicitation of capital investments from her clients.  Jensen testified on direct that he understood Wettstein was going to purchase 20% of Holzer's business, and in return, "of her estimated $200 million worth of clients that she was going to put $10 million into the company that [they] were forming."  Jensen's testimony is consistent with Wettstein's, who testified on direct that Holzer agreed "for $300,000 . . . for us to purchase 20% of her company."  Wettstein further testified that Holzer "told me she was going to raise $10 million.  In fact, the word she used to me was I could raise up to $200 million."  The whole purpose of the SPSA was to facilitate Wettstein's purchase of 20% of the common stock in BHFG for $300,000 so Jensen, Wettstein and Cappuccino could eventually capitalize Stone Ventura.

Second, the record does not support a finding that Wettstein <u>falsely</u> represented at or before signing the Note that he (a) would honor the Note when, in fact, he had no intention of complying with the Note; (b) would make payments timely on the Note when, in fact, he had no intention of making the monthly payments on the Note; or (c) would pay the Note upon default when, in fact, he had no intention of paying the Note upon default.  "A promise of future conduct is actionable as fraud only if made without a present intention to perform."  <u>Southern Union</u>, 180 F.Supp.2d at 1031 (quoting <u>Magpali v. Farmers Group, Inc.</u>, 47 Cal.App.4th 1024  (1966); <u>see Tenzer v. Superscope, Inc.</u>, 39 Cal.3d 18, 30-31 (1985) ("[S]omething more than nonperformance is required to prove the defendant's intent not to perform his promise." (citation omitted)).  In other words, "if, at the time he makes a promise, the maker honestly intends to keep it but later changes his mind or fails or refuses to carry his expressed intention into effect,

there has been no misrepresentation." <u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 787 (1st Cir. 1997).[17]  "[F]raud may be inferred from an <u>immediate</u> failure to perform a promise," but "initial performance in accordance with [a] promise negates any possible inference of fraud." <u>Kaylor v. Crown Zellerbach, Inc.</u>, 643 F.2d 1362, 1368 (9th Cir. 1981) (emphasis added).  "[I]f [a] plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury." <u>Southern Group, Inc.</u>, 47 Cal.App.4th at 1031 (quoting <u>Tenzer v. Superscope, Inc.</u>, 39 Cal.3d 18, 31 (1985).

It is undisputed that Wettstein used the funds advanced by Jensen under the Note for the intended purpose – to purchase a 20% interest in BHFG.  It is also undisputed that Wettstein made interest payments due to Jensen in accordance with the terms of the Note for the months of July, August, September, October, November, and December 2010 and the months of January and February 2011.  The Note was current for 10 months.  During that time, Wettstein worked to obtain the $10 million capital infusion to Stone Ventura promised by Holzer and to recruit other investors.  Wettstein also transferred the 20 shares of common stock in BHFG to Jensen and Millmore pursuant to the Note.  Wettstein testified on direct that he worked with Holzer to raise capital for Stone Ventura, and also had numerous investment meetings and presentations throughout L.A. and Ventura County where people were invited to learn "what Stone Ventura was doing and the opportunity to buy distressed real estate in a fund as opposed to individually buying it."  He further testified that two individuals invested in Stone Ventura, but when it became apparent that Holzer was not going to raise the $10 million, Wettstein refunded the money received from the two investors and began trying to sell the 20% interest in BHFG to generate funds to pay the Note to Jensen.  Indeed, when asked about his use of the term "fraud"

---

[17]  "The test may be stated as follows.  If, at the time he made his promise, the debtor did not <u>intend to perform</u>, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met).  If he did so intend at the time he made his promise, but subsequently decided that he could not or would not perform, then his initial representation was not false when made." <u>Id.</u> (emphasis in original).

in his email to Wettstein dated November 8, 2010,[18] Jensen admitted on cross-examination that

he did <u>not</u> believe Wettstein never intended to pay the Note:

> Q  Okay.  So did you believe that Mr. Wettstein never intended to perform on the promissory note that he signed to you?
>
> A  Do I believe that he never, ever –
>
> Q  Yes.  Do you believe that he intended to perform at the time he signed –
>         MR. DAVIS:  Objection –
>
> Q  -- the note?
>         MR. DAVIS: -- Your Honor, to relevance.
>         THE COURT:  Overruled.
>
>         A  No, I don't .  I might want to rephrase this.  <u>I don't think he intended to initially defraud, but I think that's ultimately what happened, and I think that I was made a promise that was not adhered to at all</u>.  (emphasis added)

Third, there is no evidence that Wettstein <u>falsely</u> represented to Jensen that he had

obtained Holzer's promise to use Wedbush Securities to raise $10 million in capital.  Wettstein

testified on direct that he met Holzer in late 2009 or early 2010, and that she told him, "because

of her book of business," "she could definitely find candidates to invest in Stone Ventura."

Wettstein received written confirmation from Holzer in the form of her handwritten letter

bearing the letterhead of Wedbush Morgan Securities dated April 7, 2010, which memorialized

her "intent to raise capital to fund [Wettstein's] Private Placements."[19]  After making the

agreement with Wettstein, Holzer presented Stone Ventura to Wedbush Morgan Securities and

then learned that Wedbush was no longer permitting its employees or subsidiary companies to do

private placement memorandums.  There was no credible testimony from Jensen or any other

witness that Wettstein falsely represented to Jensen <u>prior</u> his investment that he had an oral or

written  agreement with Holzer to use Wedbush Securities to raise $10 million in capital.

---

[18]  Plaintiff's Exh. # 14.

[19]  <u>Id.</u> at Exh. # 7.

At the heart of the dispute is whether Wettstein, to induce Jensen to invest $225,000 in Stone Ventura, knowingly and falsely, represented: (1) that Holzer guaranteed that she would raise $10 million in capital for Stone Ventura and (2) that Holzer personally guaranteed Jensen's investment or otherwise agreed to personally refund Jensen's investment if she failed to raise $10 million in capital for Stone Ventura. The court heard the testimony of Jensen, Wettstein, Cappuccino and Milmore.

Jensen's Testimony

Jensen testified on direct that he understood Wettstein was going to purchase 20% of Holtzer's business in return for a guaranty of funding $10 million into Stone Ventura. Jensen testified that he understood Holtzer was guaranteeing "that of her estimated $200 million worth of clients that she was going to put $10 million into the company that they were forming, and she was guaranteeing that." Jensen further testified on direct that he understood Holtzer would personally repay his investment if the company failed. When asked how he came to that understanding, Jensen responded on direct that Wettstein said so on "numerous occasions," in about a "dozen" conversations, and also "in writing in one email." However, Jensen did not testify as the date, time or place of any of these conversations or occasions nor the substance of Wettstein's statements in each of these conversations or on each of these occasions, other than to say that the conversations preceded the transfer of money. Nor do any of the emails admitted into evidence which were exchanged prior to Jensen's payment of $225,000 to Wettstein support his contention.

Jensen testified on direct that he met with Wettstein personally 3-4 times about the investment, but was only able to recall one specific meeting – a dinner with Wettstein, Cappuccion and Milmore which Jensen testified occurred in late March 2010. Jensen testified on direct that, at the dinner, Wettstein said that "Bambi was personally guaranteeing it and that her company, whether the securities company would allow her to and it didn't matter whether they did nor not, that she was still going to be responsible and guarantee the investment." However, Jensen testified on cross examination that he did not recall whether the dinner occurred before or after he had given the $225,000 to Wettstein. He then testified on

redirect that he really didn't know how many times Wettstein ever discussed Holzer's guarantee in connection with the transaction prior to the dinner.

Jensen testified on direct that he made his decision to transfer the funds after Wettstein told him about the guaranty. Jensen testified that he asked Wettstein for "copies of the personal guarantees from [Holzer to Wettstein] and from [Wettstein to Jensen] for the $300,000" in his May 20, 2010 email; and that in response thereto, he received from Wettstein the SPSA attached to Wettstein's email dated June 7, 2010, which contained a guaranty by Holzer to raise capital up to $10 million. Jensen testified that, after reviewing the June 7, 2010 email and attachment, he felt "safe in the fact that Ms. Holzer was guaranteeing the return of the investment." However, Jensen also admitted that he understood the provision in the SPSA to be Holzer's guaranty to fund the company, not Holzer's personal guaranty of his investment.

On cross-examination, Jensen testified that he believed there was supposed to be a guaranty from Holzer guaranteeing payment of the $300,000 and that she was going to pay the $300,000 within 60 days. When asked what personal guarantees he was referring to in his email to November 8, 2010,[20] Jensen replied that he was referring to the guaranty contained in the SPSA -- "the guaranty that Holzer was going to fund the company, and the company, then, would repay the $300,000." On redirect, Jensen reiterated that it was his belief that "Holzer was going to put $10 million into the company, and therefore, the company would refund [his] investment." And "if the company failed that Holzer would personally repay [his] money."

When recalled as a witness by Wettstein, Jensen admitted that he was personally involved in drafting the Note and never requested inclusion of Holzer's personal guaranty in or in conjunction with the Note. Jensen also admitted that he never demanded that Wettstein obtain a written guaranty from Holzer before he made his investment. Jensen testified that he "never had any contact with her."

---

[20] Id. at Exh. # 14.

1

_Wettstein's Testimony_

2

Wettstein denies that he ever told Jensen that Holzer either personally guaranteed to raise

3

$10 million in capital for Stone Ventura or to reimburse Jensen for his investment if she failed to

4

do so.  Wettstein testified on direct that the actual SPSA negotiated and signed with Holzer was

5

Exhibit 3, not Exhibit 2.  Wettstein testified that the first time he saw Exhibit 2 was during his

6

Rule 2004 examination on January 17, 2012.  Wettstein testified on direct that he did not believe

7

Exhibit 2 was genuine, calling it a fabrication on cross examination.  Wettstein also denies

8

sending the June 7, 2010 email admitted as Exhibit 5, although Wettstein admits that Exhibit 5

9

bears his correct email address.  Wettstein testified that he saw Exhibit 5 for the first time at his

10

Rule 2004 examination as well.  However, Wettstein admitted during his Rule 2004 examination

11

that he did, in fact, send an SPSA to Jensen at some point by email.

12

Wettstein testified on direct that the dinner with Jensen, Cappuccino, and Milmore was

13

after Jensen's investment.  "It was a celebratory dinner," according to Wettstein.  Wettstein

14

testified on direct that he did not recall if he obtained any financial information from Holzer

15

before he obtained the investment from Jensen. Wettstein testified that Jensen never asked him

16

for Holzer's financial statements nor did Jensen tell him that he would not have made the

17

investment but for Holzer's the guaranty.  However, Wettstein also admitted there were no

18

financial documents from Holzer prior to Jensen making his investment.

19

_Cappuccino's Testimony_

20

Cappuccino testified on direct that he was present and witnessed conversations between

21

Jensen and Wettstein regarding Stone Ventura, but that he could not recall those conversations

22

specifically or whether they occurred in April of 2010.  Cappuccino could only recall that they

23

had dinner together, but could not confirm whether the dinner occurred before or after Jensen's

24

investment.  Cappuccino testified on direct that "the breakdown of the deal was that Shelley was

25

giving $300,000 to Jeff to give to Bambi for a purchase portion of her investment book,[21] and in

26

---

[21]    Wettstein later testified that "Twenty percent of the company that we bought in financial

27

terms is called a book of business."

28

14

return, she was going to raise $10,000 million and of which Shelley's $300,000 would be personally guaranteed by Bambi."

Milmore's Testimony

Milmore testified only that she was present during a discussion between Jensen and Wettmore regarding Stone Ventura at a restaurant, but did not identify any facts regarding the date, time or place of the conversation. Milmore testified that Wettstein stated "a woman" was going to guarantee the investment, but Milmore did not identify the woman. When asked whether this discussion was prior to transferring the money to Wettstein, Milmore responded that "it was all around the same time. I mean, we were – yeah. Some of it was prior, I assume – yeah."

The court as the trier of fact must judge the credibility of witnesses and weigh the evidence accordingly. See, e.g., Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 512 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it."); Moore v. Chesapeake & O. Ry. Co., 340 U.S. 573, 576 ("[I]t is the jury's function to credit or discredit all or part of the testimony."). The court gives little weight to the testimony of Cappuccino and Milmore. Because neither could testify from personal knowledge whether any of the alleged representations were made prior to Jensen's investment, their testimony was of little assistance to the court. Moreover, Cappuccino and Milmore are friends of Jensen and, as pointed out at trial, Jensen has taken little action to enforce his rights against Cappuccino.

Having parsed through the conflicting testimony and documentary evidence, the court finds that Jensen has established by a preponderance of the evidence that Wettstein represented to him that Holzer guaranteed that she would raise $10 million in capital for Stone Ventura to induce him to invest $225,000 in Stone Ventura, and that Wettstein's representation was false because Wettstein had no basis in fact to make such a representation at the time it was made. Wettstein did not have an agreement with Holzer to raise $10 million in capital for Stone Ventura at the time the representation was made nor had he obtained any financial information from Holzer to determine her net worth or ability to raise such capital. Indeed, there is nothing in Holzer's letter dated April 7, 2010, that confirms any intent by Holzer to secure $10 million in

capital for Stone Ventura.  While he may have intended to pay the Note once he secured funds from Jensen, Wettstein's reckless disregard for the truth regarding Holzer's commitment to raise $10 million in capital for Stone Ventura to induce Jensen to part with his funds amounts to a false representation within the scope of § 523(a)(2)(A).

On the other hand, Jensen has not established by a preponderance of the evidence that Wettstein falsely represented that Holzer, in fact, personally guaranteed his investment or that Holzer would refund his investment in 60 days.  Not only is there no evidence of a personal guaranty by Holzer, the payment terms of the Note drafted by Jensen belies the notion that Jensen expected to receive repayment of the $225,000 loaned to Wettstein in 60 days.  At best, Jensen could only reasonably have understood that Holzer's guaranty of a $10 million capital infusion into Stone Ventura made his investment a safe bet.

2.  <u>Jensen Has Established Justifiable Reliance</u>

"Justifiable reliance is an essential element of a claim for fraudulent misrepresentation[.]" <u>Guido v. Koopman</u>, 1 Cal.App.4th 837, 843 (1991).  "Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or transaction."  <u>Southern Union Co. v. Southwest Gas Corp.</u>, 180 F. Supp.2d 1021, 1033 (D. Ariz. 2002).  In other words, a party must be 'thoroughly induced' by a fraudulent misrepresentation that, 'judging from the ordinary experience of mankind, in the absence of it he would not, in all reasonable probability, have entered into the contract or other transaction.'"  <u>Id.</u> (citation omitted).  "[A] person is justified in relying on a factual representation without conducting an investigation, so long as the falsity of the representation would not be patent upon cursory examination."  <u>Field v. Mans</u>, 516 U.S. 59, 60 (1995).  "In determining whether one can reasonably or justifiably rely on an alleged misrepresentation, the knowledge, education and experience of the person claiming reliance must be considered."  <u>Guido</u>, 1 Cal.App.4th at 843.

Jensen is a college graduate and successful television film director.  His career in the television film industry expands 25 years, and the television programs directed include

"Friends," "Fresh Prince of Belair," and "One Big Family." This wasn't Jensen's first business investment. Jensen had previously purchased a house with Wettstein in the Rincon area. The investment was profitable. Jensen had also invested with Cappuccino in a health club, a movie theater, and one or more investments related to properties in Florida. All proved unsuccessful. Jensen testified that he lost "a couple of million." Despite his losses, Jensen testified that his relationship with Cappuccino, coupled with the success of his prior investment with Wettstein, was influential in his decision to enter into a business transaction with Wettstein.

Jensen decided to invest after Wettstein told him about Holzer's guaranty. He testified that the guaranty was important to him with respect to his decision to invest in Stone Ventura because he believed it "made a safe investment." Jensen worked with Wettstein to write the Note. Wettstein testified on direct that Jensen exhibited attention to detail. "He read every document, whether it was a real estate transaction or loan documents." Since Holzer was not a party to the Note, it is understandable that Jensen expected Holzer's purported guaranty to be contained in either the SPSA or a separate document to be executed by Holzer after Wettstein paid the funds to her in consideration for ownership of a 20% interest in BHFG. Shortly after execution of the Note, Jensen asked Wettstein to produce those documents in his email dated May 20, 2010. After receiving and reviewing the SPSA attached to Wettstein's responding email dated June 7, 2010, Jensen testified that he felt "safe in the fact that Ms. Holzer was guaranteeing the return of the investment." Notwithstanding Jensen's testimony on cross-examination that he never met Holzer and did not do any investigation into Holzer's financial background before investing with Wettstein in Stone Ventura, the court finds that Jensen justifiably relied on Wettstein's representation that Wettstein had obtained Holzer's guaranty that she would raise $10 million in capital for Stone Ventura.

1

2

B.  Wettstein Is Entitled To Judgment Dismissing Jensen's Second Claim For Relief Under 11 U.S.C. §523(a)(4).

3

4

5

Jensen contends that Wettstein "had a fiduciary duty to [him]," that Wettstein "breached his fiduciary duty," and that Jensen "is entitled to damages . . . and a declaration of nondischargeability under 11 U.S.C. § 523(a)(4)."[22]

6

7

8

9

10

11

12

13

Section 523(a)(4) excepts from discharge debts incurred by "fraud or defalcation while [the debtor was] acting in a fiduciary capacity, embezzlement or larceny."  11 U.S.C. § 523(a)(4).  A defalcation is the "misappropriation of trust funds or money held in a fiduciary capacity; failure to properly account for such funds."  Lewis v. Scott (In re Lewis), 97 F.3d 1182, 1186 (9th Cir. 1996).  For his debt to be nondischargeable under § 523(a)(4), Jensen had to establish that a fiduciary relationship existed between Wettstein and himself at the time of the alleged fraud.  The Ninth Circuit has adopted a narrow definition of "fiduciary" for purposes of § 523(a)(4):

14

15

"[T]he fiduciary relationship must be one arising from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt."

16

17

18

19

20

21

22

Cal-Micro, Inc. v. Cantrell (In re Cantrell), 329 F.3d 1119, 1125 (9th Cir. 2003).  To satisfy this standard there must exist either an express or statutory trust prior to any wrongful acts.  "The essential elements of an express trust are (1) sufficient words to create a trust; (2) a definite subject; and (3) a certain and ascertained object or res."  Banks v. Gill Distrib. Ctrs., Inc. (In re Banks), 263 F.3d 862, 871 (9th Cir. 2001).  "The intent to create a trust relationship rather than a contractual relationship is the key element in determining the existence of an express trust."  Runnion v. Pedrazzini (In re Pedrazzini), 644 F.2d 756, 758 n.2 (9th Cir. 1981).

23

24

25

26

The Ninth Circuit has held that, under California law, partners are trustees over the partnership assets and thus are fiduciaries within the meaning of § 523(a)(4), but corporate officers, while possessing the fiduciary duties of an agent, are not trustees with respect to corporate assets, and therefore are not fiduciaries under § 523(a)(4).  Cantrell, 329 F.3d at 1127.

27

28

---

[22]  Joint Pretrial Stipulation, 6:13-16.

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

There is no evidence in the record upon which to find an express trust or that a fiduciary relationship existed between Jensen and Wettstein within the meaning of § 523(a)(4) at the time of the alleged fraud.  Nor is there evidence to support a finding of embezzlement.  Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come."  First Del. Life Ins. Co. v. Wada (In re Wada), 210 B.R. 572, 576 (9th Cir. BAP 1997) (quoting Moore v. United States, 160 U.S. 268, 269 (1895).  In the context of § 523(a)(4), embezzlement requires (1) property rightfully in the possession of the non-owner; (2) a non-owner's appropriation of the property to a use other than which it was entrusted; and (3) circumstances indicating fraud.  Transam. Commercial Fin. Corp. v. Littleton (In re Littleton), 942 F.2d 551, 555 (9th Cir. 1991).  Here, Wettstein received the $225,000 pursuant to the Note and used the funds as intended by the parties – to purchase 20% of the common stock in BHFG to capitalize Stone Ventura.

Because there is no evidence that Wettstein committed a fraud or embezzlement while acting in a fiduciary capacity, Wettstein is entitled to a judgment dismissing Jensen's claim under § 523(a)(4) with prejudice.

C.  Wettstein's Debt To Jensen Is Nondischargeable Under 11 U.S.C. § 523(a)(6).

Finally, Jensen claims that Wettstein's acts were "willful, wanton, malicious and oppressive," that Wettstein "willfully and maliciously injured [him]," and that "[he] is entitled to damages . . . and a declaration of non-dischargeability pursuant to 11 U.S.C. § 523(a)(6)."[23]

Section 523(a)(6) bars discharge in bankruptcy of any debt "for willful and malicious injury by the debtor . . . ."  11 U.S.C. § 523(a)(6).  Section 523(a)(6) requires separate findings on the issues of "willful" and "malicious."  Carrillo v. Su (In re Su), 290 F.3d 1140, 1146 (9th Cir. 2002).  The "willful" injury requirement of § 523(a)(6) is met "when it is shown either that the debtor had a subjective motive to inflict injury *or* that the debtor believed that injury was substantially certain to occur as a result of his conduct."  Id., at 1144 (quoting Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1208 (9th Cir.), cert. denied, 533 U.S. 930 (2001)).  A "malicious

---

[23] Id., at 5:9; 6:17-19.

1  injury" involves "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury,

2  and (4) is done without just cause or excuse." Id. at 1146-47 (quoting Jercich, 238 F.3d at 1209).

3       Jensen's case in chief and final argument focused exclusively on his claim under §

4  523(a)(2)(A).  Jensen did not address the elements of his claim under § 523(a)(6) in either his

5  trial brief nor in final argument.  Nevertheless, the court notes that fraud is an intentional tort

6  under California law.  See Moncada v. West Coast Quartz Corp., 221 Cal.App.4th 768, 781

7  (2014); City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, 68 Cal.App.4th 445, 482

8  (1999).  Fraud is self-evidently wrongful and is committed by an intentional act.  Wettstein had

9  the requisite intent to injure when he induced Jensen to loan him $225,000 based on a false

10  representation.  His act was wrongful, done intentionally, and necessarily caused injury.  Due to

11  the intentional and willful nature of the false representation, the court can imply malice.  Thiara

12  v. Spycher Bros (In re Thiara), 285 B.R. 420, 434 (9th Cir. BAP 2002).  And because Wettstein's

13  action served no legitimate goal, it was done without just cause or excuse.  Therefore, the court

14  finds that Wettstein's debt to Jensen is also nondischargeable under § 523(a)(6).

15  D.  Damages Proximately Caused By The False Representation.

16       Section 523(a)(2)(A) excepts from discharge a debt "to the extent it was obtained by"

17  fraud."  11 U.S.C. § 523(a)(2)(A) (emphasis added).  There must be some causal nexus between

18  the fraud and the debt.  See Id.  Wettstein obtained by fraud Jensen's $225,000 investment

19  evidenced by the Note.  The court takes judicial notice of Jensen's Proof of Claim # 7-2 filed on

20  November 5, 2012.  Based on the itemization set forth in his proof of claim, the court finds that

21  Jensen sustained damages of $384,220.72 as a proximate result of Wettstein's false

22  representation, which includes the following:  (1) the principal sum of $225,000; (2) accrued

23  unpaid prepetition interest of $22,809.49; (3) $77,625.00 in penalties incurred by Jensen

24  attributable to an early withdrawal of funds from his pension plan; and (4) attorneys' fees of

25  $58,786.23 incurred before the petition date to enforce his rights under the Note.[24]

26  _____

27  [24] Jensen also seeks as damages an amount upwards of $130,000 based on his promise to
   Milmore that he would "stand behind" her $75,000 investment.  Based on the evidentiary record,

28  the court cannot find a sufficiently direct causal nexus between the amount sought as damages

E.  Attorneys' Fees.

    "[T]he determinative question in cases under § 523(a)(2) is whether a successful plaintiff

could recover attorney's fees in a non-bankruptcy court."  AT&T Universal Card Servs., Corp. v.

Pham (In re Hung Tan Pham), 250 B.R. 93, 999 (9th Cir. BAP 2000).  In Santisas v. Goodlin, 17

Cal.4th 599, 608 (1998), the California Supreme Court held that, "[i]f a contractual attorney fee

provision is phrased broadly enough, . . . it may support an award of attorney fees as to the

prevailing party in an action alleging both contract and tort claims."

    In this case, the issue of whether Jensen, as the prevailing party, is entitled to an award of

attorneys' fees for prosecution of this adversary proceeding turns on the language of the

attorneys' fee provision contained in the Note, which states:

> 13.  **COLLECTION COSTS**.  Maker agrees to pay Holder's actual fees and
> costs, including, but not limited to, fees and costs of attorneys and other agents
> (including without limitation paralegals, clerks and consultants), whether or not
> such attorney or agent is an employee of Holder, which are incurred by Holder in
> collecting any amount due or enforcing any right or remedy under this Note,
> whether or not suit is brought, including, but not limited to, all fees and costs
> incurred on appeal, in bankruptcy and for post-judgment collection actions.

On its face, the attorneys' fee provision is broad enough to embrace all claims, both contract and

tort claims.  Therefore, the court finds that Jensen is entitled reasonable attorneys' fees incurred

in this adversary proceeding which may be sought by motion pursuant to LBR 7054-1(g).

CONCLUSION

    For the reasons stated, the court will enter a judgment in favor of Jensen against

Wettstein in the amount of $384,220.72 and declaring such debt is nondischargeable under 11

U.S.C. §§ 523(a)(2)(A) and (a)(6).  Jensen's claim that the debt is nondischargeable under 11

U.S.C. § 523(a)(4) will be dismissed with prejudice.  Jensen is entitled to an award of reasonable

attorneys' fees, which must be established by separate order after a motion filed pursuant to LBR

7054-1(g).

---

and Jensen's reliance on Wettstein's false representation for purposes of nondischargeability
under §§ 523(a)(2)(A) and (a)(6).

1    A separate judgment will be entered consistent with this memorandum.

2    ###

23

24    Date: March 13, 2015



Peter H. Carroll
United States Bankruptcy Judge